JOHN E. KUHN JR.
United States Attorney

CHRISTOPHER D. SCHROEDER
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: christopher.schroeder@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  vs.<br><br>DAVID CHISHOLM<br><br>    Defendant. | No. 3:21-cr-00056-SLG<br><br>**SENTENCING MEMORANDUM** |

### SUMMARY OF SENTENCING RECOMMENDATIONS

**INCARCERATION** ................................................................................34 months

**SUPERVISED RELEASE** ................................................................................ 3 years

**SPECIAL ASSESSMENT** ................................................................................ $100.00

The United States, by and through undersigned counsel, and submits this Sentencing Memorandum in anticipation of the sentencing hearing in this case scheduled for Tuesday, January 18, 2022, at 11:00 a.m.

I. **The facts and history of the case.**

Dr. David Chisholm was a licensed medical doctor who operated Camelot Family Health in Wasilla, Alaska. Dr. Chisholm advertised his clinic as specializing in family medicine and pain management.

In 2018, the DEA began investigating Dr. Chisholm's clinic after several his patients died from multi-drug overdoses. Investigators obtained Dr. Chisholm's Prescription Drug Monitoring Program (PDMP) records for the years 2014-2019. Investigators identified numerous red flags in those records that indicated Dr. Chisholm was severely overprescribing highly addictive opioids to his patients in amounts far outside the usual course of professional practice and without a legitimate medical purpose.

Between January 2014 and October 2019, Dr. Chisholm wrote 20,524 prescriptions to approximately 350 patients amounting to nearly 2 million total dosage units. These numbers were very high for a family physician. 66% of those prescriptions were for opioids, including:

- 7,571 prescriptions for oxycodone,
- 3,610 prescriptions for methadone,
- 1,317 prescriptions for hydrocodone,
- 622 prescriptions for morphine,
- 243 prescriptions for tramadol,
- 73 prescriptions for fentanyl,
- 54 prescriptions for hydromorphone, and

- 32 prescriptions for buprenorphine.

Of particular relevance was the fact that 27% of Dr. Chisholm's prescriptions were for methadone, an extremely high number for a non-methadone clinic.

Opioids, across type, are measured using Morphine Milligram Equivalents (MME), meaning an opioid dosage's equivalent to morphine. According to the CDC, clinicians should limit a patient's opioid dosage to no more than 90 mg/day. [1] If a clinician does increase a patient's dosage beyond that level, the clinician should carefully justify that decision. *Id.* Many of Dr. Chisholm's patients had MME opioid dosages far beyond 90 mg/day; some were as high as 1,000 mg/day. Dr. Chisholm's progress notes were often missing the required information that would be necessary to justify these exceedingly high levels of opioid prescriptions, and there did not appear to be any pain management plans for his patients.

Dr. Chisholm often prescribed combinations of medications, including concurrent opioids, benzodiazepines, sedatives, and carisoprodol. These combinations increased the likelihood of drug abuse among his patients. Many patients refilled their medications early, indicating that they were abusing the substances he prescribed. Many of his patients had multiple PDMP profiles because Dr. Chisholm wrote numerous prescriptions to them using different variations of their names, allowing them to continue to obtain opioids without Medicaid or private insurance companies questioning the validity of those

---

[1] *See* CDC, "Guideline for Prescribing Opioids for Chronic Pain," (undated; last accessed January 7, 2022), available at https://www.cdc.gov/drugoverdose/pdf/Guidelines_At-A-Glance-508.pdf, at p. 3.

prescriptions. 70% of Dr. Chisholm's patients had some type of criminal history, and 36% of them had criminal histories that were drug related.

At some point, Dr. Chisholm's practices became so egregious that Walmart refused to continue filling prescriptions he had written. According to a member of his staff, Dr. Chisholm and his staff responded by telling his patients to go to other pharmacies because Walmart would no longer fill his prescriptions.

The DEA conducted four undercover operations at Camelot Family Health. Each time, Dr. Chisholm wrote the undercover agent a prescription for oxycodone after little-or-no examination despite the agent indicating he had a history of opioid abuse. In two of these visits, the undercover agent declined to provide a urine sample, and in two others, he provided urine samples from a dog. In one visit, Dr. Chisholm asked, "What are we treating here?" The agent responded by asking what he needed to say to get a prescription. Dr. Chisholm leaned in towards the agent, again asked, "What are we treating here?", and laughed. He then wrote the agent a prescription for oxycodone.

In short, Dr. Chisholm wrote prescriptions for egregious amounts of opioids to anyone who was asking based on the barest of pretexts, without keeping proper records or doing any real vetting to determine whether the patients were abusing those substances. These actions came at a very real human cost.

Between 2016 and 2018, a series of Dr. Chisholm's patients died from drug overdoses. As part of this investigation, the DEA submitted Dr. Chisholm's PDMP records to an independent expert, Dr. Timothy Munzing, along with the police reports and

Medical Examiner reports for the deceased patients.  For the Court's reference, the Government will provide the Court with a copy of that report under seal and has likewise given that report to the defense in discovery.

Dr. Munzing concluded, and the plea agreement stipulates, that Dr. Chisholm's prescriptions were a significant contributing factor in the deaths of five of his patients.  In each instance, controlled substances consistent with those prescribed by Dr. Chisholm just days earlier were identified in the patient's postmortem toxicology report.  Those five patients are as follows:

1) **S.I.**

S.I. was a 54-year-old woman.  She received prescriptions from Dr. Chisholm for oxycodone, methadone, diazepam, carisoprodol, and tramadol beginning in 2014.  Her maximum MME dosage in the six months prior to her death was 567 mg/day.  During that timeframe, Dr. Chisholm wrote S.I. eight prescriptions for diazepam; eight for methadone; nine for oxycodone; one for tramadol; and one for carisoprodol.

A progress note from her last appointment in January 2016 indicated that she was unable to drive again until May 2016 because of a DUI, and that she admitted to chronic alcoholism.  Nevertheless, Dr. Chisholm wrote her a last prescription for oxycodone, methadone, and diazepam on January 13, 2016, 17 days before her death.

On January 30, 2016, she fatally overdosed on an acute combination of oxycodone, methadone, diazepam, nordiazepam, and ethanol intoxication.

//

2) **K.J.**

K.J. was a 50-year-old man. Beginning in 2006, he began seeing Dr. Chisholm for chronic lower back pain and knee pain. He received prescriptions from Dr. Chisholm for methadone, oxycodone, and alprazolam. His maximum MME dosage in the six months prior to his death was 1,185 mg/day.

In the six months prior to K.J.'s death, Dr. Chisholm wrote him eight prescriptions for alprazolam, oxycodone, and methadone. The last prescription was written two days before K.J.'s death. Dr. Chisholm's progress notes indicate he knew K.J. had a history of heroin use.

On October 26, 2017, K.J. was killed in an auto accident after he failed to turn a corner at a high rate of speed and slammed his vehicle head-on into an oncoming Ford F-150 pickup truck. The toxicology report found alprazolam, oxycodone, methadone, cocaine, benzoylecgonine (the main metabolite form of cocaine), and morphine in his system at the time of the accident.

3) **J.L.**

J.L. was a 41-year-old man. He began seeing Dr. Chisholm in 2007 for shoulder and knee pain stemming from a work-related injury. Several of Dr. Chisholm's progress notes documented that J.L. had a history of abusing methamphetamine. Similarly, a 2012 note from J.L.'s orthopedic surgeon stated, "Any additional surgery would be disastrous… He has a severe addiction to oxycodone."

In the sixth months prior to J.L.'s death, Dr. Chisholm wrote him seven prescriptions

for oxycodone and zolpidem. J.L.'s maximum MME dosage in that time was 112-145 mg/day. His last prescription was written eight days before his death.

On September 21, 2018, J.L. fatally overdosed on an acute combination of opiate (heroin), oxymorphone, methamphetamine, and amphetamine intoxication.

4) **D.R.**

D.R. was a 54-year-old man who began seeing Dr. Chisholm in 2009 for chronic lower back pain and shoulder pain. Within the six months prior to his death, Dr. Chisholm wrote D.R. six prescriptions methadone and oxycodone and one prescription for carisoprodol. His maximum MME dosage during that time was 455 mg/day. His last prescription was written eight days before his body was discovered

On July 28, 2016, D.R.'s brother found him dead in his home. He had been dead for several days. The cause of death was determined to be chronic ethanol abuse – history of esophageal varices mild, postmortem muscle tissue – methamphetamine concentration, and postmortem muscle tissue – methadone concentration.

5) **V.S.**

V.S. was a 57-year-old woman recovering from breast cancer. She struggled with alcohol abuse, depression, anxiety, COPD, and emphysema, among other things. She saw Dr. Chisholm frequently from the early 2000s up until her death. Dr. Chisholm's notes indicate that she had a history of abusing medication, including methadone.

In the six months prior to V.S.'s death. Dr. Chisholm wrote her six prescriptions for zolpidem, five for alprazolam, five for hydrocodone, five for methadone, and three for

dronabinol.  Her maximum MME dosage in that time was 540 mg/day.  The last prescription was written 17 days before her death.

On July 29, 2017, V.S. fatally overdosed from an acute combination of methadone and methamphetamine.

**II. Procedural history of this case.**

On April 30, 2021, Dr. Chisholm waived his right to a grand jury and was charged by information with a single count of distributing controlled substances outside the usual course of professional practice and without a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).  Dkt. 1.  He pleaded guilty at arraignment on June 3, 2021, to the single count of the information.  Dkt. 15.

The Controlled Substances Act establishes a sentencing range of not more than 20 years imprisonment for a violation of § 841(b)(1)(C).  When "death or serious bodily injury results from the use of such substance[,]" however, the defendant "shall be sentenced to a term of imprisonment of not less than twenty years or more than life[.]"  *Id.*  As part of the plea agreement, the parties stipulated to the following:

> "The defendant's prescription of these controlled substances was one of the significant contributing factors in the accidental deaths of five patients:   S.I., K.J., J.L., D.R., and V.S.  The parties agree, however, that had this matter proceeded to trial, the United States would not have been able to establish that the defendant's prescriptions were the but-for-cause of any of these accidental deaths."

Dkt. 13 at 4.  The terms of the plea agreement ensured that Dr. Chisholm accepted responsibility for the deaths of five of his patients that resulted, at least in part, from his unlawful prescriptions.  The parties also agreed, however, that the enhanced penalty

*U.S. v. David Chisholm*
3:21-cr-00056-SLG                                      Page 8 of 18

Case 3:21-cr-00056-SLG-MMS   Document 30   Filed 01/10/22   Page 8 of 18

provision – which would have resulted in a mandatory minimum of 20 years imprisonment – did not apply. *See Burrage v. United States*, 571 U.S. 204 (2014) (requiring but-for causality to trigger the enhanced penalty provisions); *see also Young v. Antonelli*, 982 F.3d 914, 919-20 (4th Cir. 2020) (holding that the § 2D1.1(a)(2) enhancement, which establishes a base offense level of 38 where "death or serious bodily injury resulted from the use of the substance," also requires but-for causation).

### III. Sentencing calculations.

#### A. Statutory mandatory minimum and maximum sentence.

Count 1 is a Class C felony. *See* 18 U.S.C. § 3559(a)(3). It carries no mandatory minimum and a potential maximum of 20 years imprisonment. *See* 21 U.S.C. § 841(b)(1)(C). The Court may impose a discretionary fine of not more than $1,000,000. *Id.* The Court must impose a period of supervised release to follow Dr. Chisholm's release from prison of at least than three years. *Id.* The offense also includes a mandatory special assessment of $100.00. *See* 18 U.S.C. § 3013(a)(2)(A).

#### B. Sentencing guidelines calculation.

The PSR accurately calculated the total offense level as 23. The base offense level for a distribution offense involving 631.08 kilograms of converted drug weight was 26. Dkt. 29 at ¶ 27. From this, the Probation Office subtracted two levels because Dr. Chisholm qualified for the safety-valve. *Id.* at ¶ 28 (citing USSG § 2D1.1(b)(18)). The Probation Office added a two-level enhancement because Dr. Chisholm abused a position of public or private trust in committing the offense. *Id.* at ¶ 30 (citing USSG § 3B1.3).

Finally, the Probation Office subtracted three levels for acceptance of responsibility and timeliness. *Id.* at ¶ 34 (citing USSG § 3E1.1(a), (b)). This resulted in a total offense level of 23. *Id.* at ¶ 26.

With no prior convictions, Dr. Chisholm's Criminal History Category was I. *Id.* at ¶¶ 37-40. The Guideline range was therefore 46-57 months imprisonment. *Id.* at ¶ 64.

### C. Any objections to the PSR.

Neither party submitted any unresolved objections to the presentence report.

## IV. Application of the 18 U.S.C. § 3553(a) sentencing factors.

For the ease of discussion, the Government will address the sentencing factors out of order.

### A. Any pertinent Guideline policy statements.

In the Government's opinion, there are three Guideline policy statements that potentially bear on this case.

#### i. Abuse of a position of trust - § 3B1.3

First, the Probation Office assessed a two-level enhancement under USSG § 3B1.3 because Dr. Chisholm abused his position as a medical doctor to unlawfully dispense and distribute controlled substances to his patients without a legitimate medical purpose. According to the commentary to USSG § 3B1.3, "This adjustment applies to persons who abuse their positions of trust or their special skills to facilitate significantly the commission or concealment of a crime.… Such persons generally are viewed as more culpable." USSG § 3B1.3 cmt. background.

### ii. If death resulted - § 5K2.1

Second, USSG § 5K2.1 provides: "If death resulted, the court may increase the sentence above the authorized guideline range." It is unclear whether this provision also requires but-for causality. *See United States v. Grant*, 803 F. App'x 327, 331 n. 6 (11th Cir. 2020) (holding that the district court did not plainly err by departing upward under § 5K2.1 based on the victim's death, noting the absence of governing precedent regarding whether a but-for causation requirement applies). Given that uncertainty in the law, the Government has elected not to press an argument in this case that the Court should depart upward based on this Guideline.

However, "[e]ven if the but-for causation standard applies to a sentencing departure under the Guidelines, it is not similarly required for an upward variance under § 3553(a)." *United States v. McKinnie*, --- F. 4th ----, 2021 WL 6110290, at *4 (4th Cir. Dec. 27, 2021). "When considering a variance, district courts may thus consider evidence that a defendant's actions contributed to death or serious injury. This is so even if the evidence is insufficient to meet the but-for causation standard required for the 'death results' enhancement under the Sentencing Guidelines[.]" *Id*. *See also United States v. Heindenstrom*, 946 F.3d 57, 63 (1st Cir. 2019) (but-for causation was not required for an upward variance where the victim died from the use of drugs knowingly sold to him by the defendant). The deaths of the five patients, though not relevant to the Guidelines, are relevant to the Court's § 3553(a) analysis.

//

//

### iii. Public health or safety - § 5K2.14

Third, USSG § 5K2.14 provides: "If national security, public health, or safety was significantly endangered, the court may depart upward to reflect the nature and circumstances of the offense." Dr. Chisholm's conduct in overprescribing vast quantities of highly addictive opioids to his patients over a period of several years certainly endangered public health and safety in the Wasilla community.

### B. The nature and circumstances of the offense and history and characteristics of the defendant.

The nature and circumstances of the offense deserve significant weight. It is here that the Court should consider the fact that Dr. Chisholm's prescriptions were a significant contributing factor in the deaths of five of his patients. That fact renders the offense in this case significantly more serious than a typical offense involving a violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). The harm that resulted – in whole or in part – from Dr. Chisholm's actions destroyed lives, families, and contributed to the ongoing poisoning of our community by the flood of opioids wrongly prescribed by him and others like him. Under these facts, the Probation Office's recommendation of a sentence of probation is inappropriate and insufficient to account for the scale of the harm in this case.

Dr. Chisholm's patients went to him for treatment of their pain. In doing so, they placed their trust in him that they would receive proper medical treatment; that he would do them no harm; and that their best interests would be looked after. Dr. Chisholm, with his position of trust and authority as a medical doctor, was in a unique position to help his patients by weaning them off these potentially deadly substances and by developing pain

management plans for them. Instead of using his position of trust and authority to provide the best possible medical care, however, he chose to overprescribe them harmful substances without a legitimate medical purpose that kept them slaves to their addictions and ruined their lives. Opioid abuse and overdoses are at epidemic levels in the United States. As a result of his actions, Dr. Chisholm's patients lost years of their lives, and their families lost loved ones to death, addiction, or estrangement.

The defendant is a 64-year-old, well-educated individual. He received his Doctor of Medicine degree from State University of New York, Upstate Medical Center, in 1984. He practiced medicine for many years. His extensive education and training demonstrate that he knew, or should have known, better. Although this is his first criminal conviction, the conduct in this case took place over a period of many years. All five deceased patients began receiving prescriptions from Dr. Chisholm at least as early as 2014 (and oftentimes earlier) and continued receiving them until their deaths. Dkt. 29 at ¶¶ 8, 11, 14, 17, and 20. Over those years, he had ample time to consider what he was doing and to change his course of action. Had he done so at any point, the harm in this case might yet have been minimized to a fraction of what it is today.

All of us are searching for a way out of the opioid epidemic that has engulfed this country. But for that better world to be born, crimes such as what happened in this case cannot exist. This Court should impose a prison sentence in this case that is a sufficient response to the devastating nature and circumstances of this offense.

//

### C. The need for the sentence to reflect the seriousness of the offense, afford deterrence, and protect the public from further crimes.

Deterrence comes in two forms: (1) specific deterrence, in which the Court prevents the defendant himself from committing crimes in the future, and (2) general deterrence, in which the Court acts to deter criminal actions by others who may contemplate committing similar offenses. Specific deterrence is not at issue in this case because Dr. Chisholm voluntarily surrendered both his DEA Certificate of Registration and his Alaska State Medical License. His medical career is over, and there is thus no risk that he will ever resume prescribing controlled substances in the future.

General deterrence, however, is very much a consideration for this Court. Across this country, licensed medical professionals routinely overprescribe highly addictive substances such as oxycodone, methadone, hydrocodone, and others, without a legitimate medical purpose. According to the CDC, 100,000 Americans died of drug overdoses between April 2020 and April 2021, an increase of 28.5% from the year before.[2] Overdose deaths from opioids increased from 56,000 to more than 75,000 in the same period, a staggering increase of 35% in just one year. *Id.* Despite all efforts to this point, the illicit prescribing of prescription pain medications continues to increase, fueled by a steady supply of "patients," the lure of easy financial rewards, and the ability to easily disguise dangerous levels of prescriptions through deception.

---

2 *See* CDC, "Drug Overdose Deaths in the U.S. Top 100,000 Annually," (November 17, 2021; last accessed January 9, 2022), available at https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2021/20211117.htm.

This epidemic starts with prescribing physicians; people like this defendant, who contributed millions of tablets to an ocean of opioids. The medical community is made up of educated people who follow these cases closely and who make a conscious, daily decision to act in this manner. Successful criminal prosecution offers an opportunity to show these prescription drug gatekeepers that their status as medical doctors does not place them above the law, and that illegally prescribing controlled substances without a legitimate medical purpose is a serious crime that will result in imprisonment.

A street dealer who distributed these amounts of controlled substances would receive a significant, and likely much lengthier, prison sentence. This defendant should not be treated differently because he is a white-collar professional with a medical license to surrender. The concept of general deterrence has "value in the process of imposing punishment because it works to keep judges from succumbing to the impulse to see white-collar defendants in the warm light of a contrite individual who engaged in aberrational conduct but is unlikely to offend again." Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*, 61 Wayne L. Rev. 27, 32 (2015). It likewise has value in protecting the public by deterring other licensed medical professionals from causing similar harm.

**D. The need for the sentence to provide the defendant training and treatment.**

Dr. Chisholm is not addicted to any substances. Although the PSR indicates that he previously took antidepressants to treat depression and bipolar disorder, a recent evaluation indicated he likely never had bipolar disorder, and he no longer takes any

medications.  Dkt. 29 at ¶ 50.  The Government agrees with the Probation Office that there is no indication any particular sentence is necessary to address this factor.  *Id.* at 2.

### E. The kinds of sentences available.

This Court has full discretion to impose a sentence of anywhere up to 20 years imprisonment.

### F. The established Guidelines sentencing ranges.

As calculated by the Probation Office, the advisory Guidelines range in this case is 46-57 months.  "[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Carty*, 520 F.3d 984, 994 (9th Cir. 2008) (quoting *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006)).

### G. The need to avoid unwarranted sentence disparity between defendants with similar records convicted of similar crimes.

The PSR includes data from the U.S. Sentencing Commission's Judiciary Sentencing Information (JSIN) program indicating that during fiscal years 2016-2020, for offenders whose primary guideline was § 2D1.1, with a total offense level of 23, and a Criminal History Category of I, the average length of imprisonment was 32 months, and the median length of imprisonment was 36 months.  Dkt. 29 at 3.

Additionally, according to data compiled by the Sentencing Commission's Interactive Data Analyzer program, in the District of Alaska in fiscal year 2020, there were 11 cases in which the primary guideline was § 2D1.1 and the defendant's Criminal History Category was I.  The average length of imprisonment imposed in those cases was 51

months and the median length of imprisonment imposed was 30 months.   *See* Exhibit 1.   91% (10 out of 11) of those defendants received prison sentences.   *Id.*

As noted in the PSR, these numbers do not account for the aggravating factor that Dr. Chisholm was a medical professional who abused his position to unlawfully prescribing these medications.   Dkt. 29 at 3.   Nor do they account for the fact that Dr. Chisholm's prescriptions were a significant contributing factor to the deaths of five of his patients.

**H. The need to provide restitution to victims of the offense.**

There are no victims of the offense to whom this Court must order restitution at sentencing, and the Government will not be seeking any restitution at sentencing.

**V. CONCLUSION**

For the foregoing reasons, the Government respectfully asks this Honorable Court to impose a sentence of 34 months imprisonment, followed by three years of supervised release, and a $100 mandatory special assessment.

RESPECTFULLY SUBMITTED January 10, 2022, at Anchorage, Alaska.

JOHN E. KUHN JR.
United States Attorney

*s/ Christopher D. Schroeder*
CHRISTOPHER D. SCHROEDER
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the
foregoing was served electronically
on all counsel of record
via the CM/ECF system:

Nick Oberheiden

*s/ Christopher D. Schroeder*
Office of the U.S. Attorney